**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
 -------------------------------------------------------------------X
KRISTINE CHEVANNES,                                     Case No:

                            Plaintiff,

                                     **COMPLAINT**

     -against-

PROHEALTH CARE ASSOCIATES, LLP,        PLAINTIFF DEMANDS
                                            A TRIAL BY JURY

                            Defendant.
 -------------------------------------------------------------------X

Plaintiff, KRISTINE CHEVANNES, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendant PROHEALTH CARE ASSOCIATES, LLP, upon information and belief, as follows:

**NATURE OF THE CASE**

1.     Plaintiff  complains pursuant to (i) **The Americans with Disabilities Act of 1990**, 42 U.S.C. § 12101, *et seq*. ("ADA"); (ii) **Title VII of the Civil Rights Act of 1964**, as amended ("Title VII"); (iii) the **New York State Human Rights Law**, New York State Executive Law § 296, *et seq.* ("NYSHRL"), and (iv) the **New York Labor Law**, §§ 740 & 741 (whistleblower protections), and seeks damages to redress the injuries Plaintiff suffered as a result of being **discriminated** against on the basis of her **disability**, **sexual orientation**, and **sex**, by her employer in **retaliation** for requesting a reasonable accommodation. Plaintiff requested to work from home as she is at high risk for serious illness should she contract COVID-19, and Defendants denied that request without offering any reasonable accommodation. Plaintiff was further retaliated against when she reported that patient's Protected Health Information (PHI) was being improperly disseminated in violation of HIPAA laws.

## JURISDICTION AND VENUE

2.     Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343 as this case is Federal Question jurisdiction.

3.     The Court has supplemental jurisdiction over the claims of Plaintiff brought under state laws pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the actions or omissions giving rise to the claims for relief occurred within this judicial district.

## PROCEDURAL PREREQUISITES

5.     Plaintiff timely filed a Charge of Discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6.     Plaintiff received a Notice of Right to Sue from the EEOC, dated February 17, 2022, concerning the herein charges of discrimination.  A copy of the Notice is annexed hereto.

7.     This action is being commenced within 90 days of receipt of said Notice of Right to Sue.

## PARTIES

8.     Plaintiff KRISTINE CHEVANNES (hereinafter "Plaintiff") is a gay woman and a resident of the State of New York, Nassau County.

9.     At all relevant times, Plaintiff was employed as a Licensed Practical Nurse ("LPN") by PROHEALTH CARE ASSOCIATES, LLP (hereinafter "Defendant" or "PROHEALTH"), with, upon information and belief, a principal place of business located at 1 Dakota Drive, Suite 320, Lake Success, New York 11042. Plaintiff worked at Defendant's office located at 2 Ohio Drive, Suite 102, North New Hyde Park, NY 11042.

10. Defendant PROHEALTH is a domestic limited liability partnership operating under the laws of the State of New York engaged the provision of health-care services.

11. Defendant is an "employer" under the relevant statutes and at all relevant times herein. Defendant "employs" more than fifteen employees, and thus more than 4 employees, and is therefore an "employer" within the meaning of Title VII, the ADA, AND the NYSHRL.

12. At all relevant times, Plaintiff was an employee of Defendant.

## **MATERIAL FACTS**

13. On March 23, 2020, Plaintiff began working for Defendant as a Licensed Practical Nurse ("LPN"). Plaintiff's rate of pay with Defendant was twenty-eight dollars ($28) per hour and was entitled to overtime.

14. During her tenure, Plaintiff's work performance met or exceeded Defendant's legitimate expectations.

15. Plaintiff suffers from severe asthma, which condition can be further exacerbated by allergies. Given the Covid-19 pandemic, Plaintiff is considered high-risk for Covid-19.

16. During the Covid-19 pandemic, Defendant engaged in sanitization of its place of business in the office where Plaintiff worked.

17. The particular chemicals utilized by Defendant exacerbated Plaintiff's asthma.

18. Adding to this, Plaintiff was not allowed to bring her nebulizer to work, a medical device used for the purpose of facilitating a person's breathing, as it was against CDC guidelines at that time. This meant that when Plaintiff exhibited asthmatic symptoms, Plaintiff was unable to resolve her symptoms without medical attention.

19. Therefore, on multiple occasions Plaintiff required the assistance of Defendant's on-site asthma specialist and emergency inhaler to relieve her symptoms.

20.     Defendant also routinely prevented Plaintiff's partner from bringing Plaintiff her medication while at work.

21.     On one occasion, when Defendant did allow Plaintiff's partner to bring Plaintiff her medication, Plaintiff's co-workers noticed that Plaintiff's partner was female. Upon this realization, Plaintiff became experienced faced harassment from her peers due to her sexual orientation.

22.     In addition, when Plaintiff disclosed to her co-workers that she was attempting to conceive a child with her partner via in-vitro fertilization, several of Plaintiff's co-workers, in particular Dr. Caprarella and Debbie Tilli, began questioning Plaintiff's decisions and encouraging her to refrain from conceiving due to her sexual orientation.

23.     For example, these co-workers would say "If I was you, I wouldn't be doing that," "Do you really think that's the best idea?", "Are you sure you and your wife are ready for more children?", and "Do you have to go out of work?"

24.     Plaintiff's co-workers would also routinely allude to there being something wrong with Plaintiff's sexual preferences.  These co-workers would also force Plaintiff to explain her sexual preferences by incessantly interrogating Plaintiff regarding her sexual preferences. Indeed, the regularity with which these co-workers asked Plaintiff "Are you pregnant yet, do you need to go out of work?", brought Plaintiff to the realization that her co-workers were not concerned or curious, they were actively looking for a reason to terminate her.

25.     Given Plaintiff's repeated medical emergencies resulting from Defendant's cleaning supplies, and Plaintiff's increased risk for Covid-19 complications as a result of her asthmatic condition, Plaintiff consulted her Primary Care Physician ("PCP").

26.   On May 18, 2020, Plaintiff's Primary Care Physician wrote Plaintiff's employer indicating that Defendant should "excuse the above-named patient from on-site work" as a result of Plaintiff's asthmatic condition.

27.   On May 18, 2020, Plaintiff requested a reasonable accommodation to work from home.

28.   Defendant subsequently granted Plaintiff's accommodation and Plaintiff began to work from home shortly thereafter on May 17, 2020.

29.   At this time, Plaintiff was told by Erica Tilli, Operations Supervisor, that: (1) that there were no corporate phones or computers available for Plaintiff's use while Plaintiff was working from home, and (2) that it was acceptable for Plaintiff to utilize her own home phone and personal computer for the transmission of Protected Health Information (PHI) to and from Defendant's place of business while Plaintiff worked from home.

30.   On June 17, 2020, Plaintiff e-mailed her immediate superior, Erica Tilli, Operations Supervisor, informing her that the phones had not been turned off the previous night and that she had been receiving calls late into the night. She also noted that multiple calls came in at a time and that she was unable to answer both calls simultaneously.

31.   In addition, patients now had Plaintiff's personal cell number and were bombarding her with calls and texts.  Plaintiff requested that IT set up a voice IP through the remote server and noted a possible HIPAA compliance issue which could jeopardize her nursing license.

32.   Plaintiff also emailed Defendants complaining that communicating with Defendants using her personal phone and computer constituted a HIPAA violation.

33.   On June 17, 2020, Plaintiff's supervisor, Erica Tilli, e-mailed Plaintiff acknowledging her email, but suggesting no solution.

34.     Later that day, Plaintiff's computer was hacked, and she was forced to file a security report concerning the HIPAA violation and potential dissemination of PHI. In the following weeks, Plaintiff engaged with Optum's[1] Privacy Office, Investigations, in response to the data breach.

35.     On June 30, 2020, Plaintiff e-mailed her supervisor regarding the security report and informed her that she had spoken with Hayley Breen in HR for Defendant PROHEALTH to resolve the remote work issues concerning calls forwarded to her home phone. She informed Ms. Tilli that she did not "think deviation from [her] physicians' instructions would be appropriate at this time and will continue working remotely."

36.     On July 2, 2020, while Optum investigated the data breach, Plaintiff informed Optum that she had previously requested a reasonable accommodation to work from home (which Defendant approved) and was told by Defendant that no work computers were available at that time. In this e-mail, Plaintiff also indicated that she had expressed concern about retaining PHI on her personal device and had requested to not use her personal devices.

37.     Plaintiff was then informed by Optum that Protected Health Information (PHI) should not be sent via e-mail, contrary to Defendant ProHealth's initial representations to Plaintiff.

38.     While Plaintiff informed Defendant ProHealth of Optum's directive, Defendant ProHealth contradicted Optum and continued telling Plaintiff she should continue sending PHI so long as her e-mails were encrypted.  Plaintiff objected to this assertion by Defendant in that this constituted yet another HIPAA violation.

39.     Defendants subsequently retaliated against Plaintiff in response to Plaintiff's cooperation with Optum's Privacy Office and disclosure of Defendant's HIPAA violations.

---

[1] Upon information and belief, Optum is Defendant's parent company.

40.   Following Plaintiff's filing of the compliance incident report, which resulted from Defendant's failure to provide Plaintiff with secure company equipment to work from home, Plaintiff was told that her accommodation of working from home was being rescinded.

41.   Plaintiff was not provided with a reason for the rescission of her accommodation.

42.   Upon information and belief, Defendant's decision to rescind Plaintiff's accommodation was in retaliation for her reporting Defendant's HIPAA violations.

43.   Meanwhile, as Plaintiff worked from home, her job duties were changed without explanation.  For example, she was singled out and/or not included in meetings, meetings were purposely scheduled during times she was not working, and Plaintiff's supervisor and co-worker, a mother-daughter tandem, began telling Plaintiff to quit.

44.   At or around this time, Dr. Caprarella and Debbie Tilli continued making inappropriate comments about Plaintiff's sexual preferences and attempts to conceive a child utilizing in-vitro fertilization.  For example, Dr. Caprarella would reference Plaintiff's partner, openly question Plaintiff's decision, and then criticize Plaintiff and tell her that she shouldn't be having a baby.  Further, Dr. Caprarella would also discuss the risks of utilizing in-vitro fertilization in an apparent attempt to discourage Plaintiff's decision to have a child.

45.   Plaintiff took great offense to Dr. Caprarella and Debbie Tilli's comments, which she understood as discriminatory.

46.   Also, in this respect Plaintiff's personal information was shared among her co-workers in that Plaintiff's sexual preferences and personal information were regularly critiqued and/or commented on by supervisors and co-workers during this time. For example, Plaintiff's

concerns regarding a lump in her breast and subsequent doctor's visit were shared with her co-workers. Indeed, comments regarding Plaintiff's sexual preferences were commonplace between her co-workers. Plaintiff was humiliated, in part because it was primarily her superiors who were conducting and condoning the criticism of her sexual preferences.

47.    Plaintiff was also told that while she continued to work from home until Defendant effectuated the rescission of her accommodation, that she was to forward desk calls to her home phone number. Plaintiff was told that refusal would be considered a resignation.

48.    Defendant's insistence that Plaintiff use her home phone number meant that patients continued to have Plaintiff's personal cell and home phone number. These patients would send her text messages throughout the day, leave voicemails on both her home phone and cell phone throughout the day, and would spontaneously call her for medical advice now that they had her home and cell phone number.

49.    All of these interactions constituted HIPAA violations, which Plaintiff had been and continued to report and complain to Defendant. Indeed, Plaintiff also reported these HIPAA violations to the Department of Labor ("DOL").

50.    In addition, Defendant would "forget" to turn off their phones after hours and even all-weekend long, meaning that Plaintiff continued receiving phone calls from patients late at night, early in the morning, and on weekends.  This caused Plaintiff great emotional distress especially given that Plaintiff has two small children.

51.    At or around this time, Plaintiff again suggested using a voice IP as a compromise.  Using a voice IP would've allowed Plaintiff to receive calls from patients without having to use her home and cell phone numbers.  This would have prevented potential HIPAA violations, but Defendant refused.

52.   Plaintiff repeatedly complained of these issues given the potential HIPAA violations, in particular, during the week of July 4, 2020.

53.   Also, during this time Defendant repeatedly told Plaintiff that her accommodation was a "privilege," that Defendant was not legally obligated to provide the requested accommodation, and that working from home was "not a job," even during the Covid-19 pandemic.

54.   Adding to the discrimination, Plaintiff was also scheduled for in-office training despite her physician's instructions. For example, on July 2, 2020, Emily Mei, Implementation and Training Manager, e-mailed Plaintiff with a reminder about EMR Training scheduled in-office on July 7, 2020.

55.   During the time following the security compliance incident, Plaintiff was also required to provide a daily e-mail summary of her completed work to her co-worker, rather than to her supervisor.  She had not been required to do so prior to reporting Defendant's conduct. This protocol was put into place by Ms. Tillis, who, as noted above, began harassing Plaintiff following the security incident.

56.   Plaintiff explained that she was uncomfortable with this new assignment and questioned whether it was retaliatory.

57.   Debbie and Erica Tilli also regularly made jokes to Plaintiff and Plaintiff's co-workers that Plaintiff should and/or was quitting. This tandem would also regularly change Plaintiff's duties and refuse to discuss these changes with Plaintiff.  Debbie Tilli would also routinely comment, question, and criticize Plaintiff's sexual preferences.

58.   On July 9, 2020, Melissa Viera e-mailed Plaintiff stating that a summary of her daily tasks were to be sent to herself, Debbie Tilli, and Erica Tilli.

59. Plaintiff responded that, pursuant to her meeting with the privacy officer at Optum, documents containing PHI should not be shared via e-mail and that they needed a secure place to share these things.

60. Regardless, Defendant told Plaintiff to continue sending e-mails containing PHI.

61. Given these concerns and conflicting directives, Plaintiff contacted Hayley Breen and voiced her concerns with sending PHI over her personal computer.  Plaintiff also asked that her supervisors clarify her "roles, responsibilities, and expectations to better meet the needs of the job and the team."

62. On July 10, 2020, Plaintiff e-mailed Dr. Caprerella asking that they meet to discuss roles, responsibilities, and expectations. Plaintiff also asked that Defendant clarify her daily responsibilities, some of which were contrary to the directives she had been given by Optum's privacy officer and privacy attorney.

63. On July 17, 2020, Plaintiff's physician again advised Defendant that it should "allow her to continue to work from home due to medical condition."

64. Regardless, Plaintiff was subsequently told that she had to return to the office on July 20, 2020. Defendant did not provide any alternative reasonable accommodation or engage with Plaintiff in an interactive process at the time Defendant ordered her to return in-office.

65. When she informed Defendant that her doctor's orders prevented her from returning to in-office work, Plaintiff was told that she should apply for leave.

66. Plaintiff then applied for FMLA leave, which she was denied for due to an ineligible length of employment.

67.     Defendant then informed Plaintiff that personal leave was her only option because her "condition has no pre-determined amount of time, is related to pre-existing conditions and/or covid, and did not constitute a qualifying disability."

68.     Even after providing doctor's notes, Defendant told Plaintiff that her doctor's request for no on-site work did not qualify as an accommodation or ADA leave because her asthma was not a "measurable disability." Defendant also requested more information from her Doctor and Plaintiff's full and complete medical records.

69.     On or around July 28, 2020, Plaintiff contacted the Department of Labor ("DOL") regarding the discrimination, harassment, and retaliation she experienced as noted above.

70.     In or around the same time, Plaintiff again contacted Hayley Breen lodging a discrimination and retaliation complaint regarding disability and sexual orientation.  Ms. Breen offered no alternatives and failed to address Plaintiff's complaints or take any corrective action.

71.     On July 31, 2020, Plaintiff submitted a request for a personal leave of absence due her underlying health conditions that make her vulnerable to serious illness or worse from COVID-19.

72.     On or about August 12, 2020, Plaintiff's request for personal leave was approved through September 11, 2020. Defendant informed Plaintiff that she would have to complete a physical assessment form, which Defendant did not provide to her.

73.     While out on approved personal leave, Plaintiff continued contacting the DOL as Defendants demanded that she return to work in-person, which was against her doctor's orders.

74. Adding to Plaintiff's concerns, at least two (2) cases of coronavirus were confirmed in Defendant's office. Upon information and belief, additional employees tested positive for coronavirus, but were compelled to continue working.

75. On August 4, 2020, Plaintiff again e-mailed Hope Martinez from the Department of Labor indicating that other employees were harassing her regarding a rumor that she was quitting, that she felt that Defendant was forcing her to end her employment in retaliation for working remotely, and that the head doctor, Dr. Caprarella, was making inappropriate comments about her sexual orientation and family planning

76. Plaintiff further indicated that she was being constructively discharged.

77. During the DOL investigation, Defendant for the first time proffered that Plaintiff was offered a special entrance and a private office as an accommodation during her employment.

78. However, at no time was Plaintiff, in fact, offered a private entrance. Moreover, a private office and special entrance are not reasonable because it would not have prevented exposure to contagious individuals in common areas within the building.

79. In or around August 2020, Defendant informed its employees that those employees who were working from home would be required to return to the office.

80. At the end August, as her personal leave was ending, Plaintiff was told that she was being given her "final warning" and that failure to return would result in termination.

81. Plaintiff then provided updated instructions from her physician stating that she should not return to work.

82. Defendant then asked for Plaintiff's resignation and told her that full-time employees were not allowed to work outside the office full time.

83. Plaintiff was also not originally informed that she was able to extend her leave. On September 11, 2020, the day Plaintiff was set to return in office, Plaintiff was informed that she could, in fact, extend her leave.

84. Plaintiff then requested that her leave be extended until November 12, 2020. While Defendant approved leave until October 25, 2020, Defendant nonetheless denied Plaintiff leave from October 26, 2020 to November 12, 2020. Defendant's stated reason was "Leave not Approved by HR Department." Defendant provided no further explanation.

85. On October 11, 2020, Plaintiff had emergency surgery for Gastric volvulus, a serious illness requiring significant recovery.

86. On October 27, 2020, Plaintiff requested another extension for her leave of absence due to the emergency surgery and continued Covid-19 risks.

87. Defendant denied Plaintiff's request for an extension and provided no reason for the denial.

88. On October 28, 2020, Angelica Cintron e-mailed Plaintiff stating that "we require your response for your intention to return to office no later than Friday, October 30th." Plaintiff then called and spoke to Ms. Cintron, who informed her that she needed to return to the office in the following two (2) weeks, and asked Plaintiff to provide a response by Friday, October 30, 2020.

89. On October 31, 2020, given Plaintiff's medical conditions, recent surgery, and doctor's orders, Plaintiff e-mailed Defendant indicating that "due to my current health status I am not physically able to return to work in office."

90. On November 17, 2020, Defendant sent a letter to Plaintiff terminating her employment.

91. On November 18, 2020, prior to receiving her termination letter, Plaintiff e-mailed Defendant expressing her desire to return to work, again reiterated her requested

accommodation to work from home, and noted that Defendants refused to grant the accommodation or further engage with her.

92.    Instead, Defendant terminated Plaintiff.

93.    Plaintiff was discriminated against because of her disability, gender, and sexual orientation. But for the fact that Plaintiff was a gay female, Defendants would not have treated her differently.

94.    Plaintiff suffered a hostile work environment based on her actual and/or perceived disability and in retaliation for seeking an accommodation for his disability and complaining about discrimination.

95.    Plaintiff was discriminated and retaliated against because she engaged in the protected activity of disclosing, objecting, and refusing to participate in an activity, policy or practice in violation of a law, rule or regulation.

96.    Plaintiff reasonably believed Defendant's HIPAA violations and illegal activity constituted improper quality of patient care.

97.    Defendants knew or should have known of the discriminatory and retaliatory conduct taken against Plaintiff and failed to take corrective measures within their control.

98.    Defendant terminated Plaintiff's employment because of her disability, request for an accommodation, and in retaliation for complaining about discrimination.

99.    Plaintiff's severe allergies qualify as a disability protected under the ADA and the NYSHRL.

100.    Contrary to the law, Defendants failed/refused to engage in any interactive process when Plaintiff requested an accommodation.

101.    Defendants made no assessment to determine if an accommodation for Plaintiff would cause them undue hardship, difficulty, or expense.

102.    Instead of engaging in any interactive process, Defendants subjected Plaintiff to a hostile work environment.

103.    Defendants wrongfully denied Plaintiff's request for an accommodation and retaliated against Plaintiff.

104.    Defendants had no good faith business justification for the discriminatory and retaliatory hostile work environment.

105.    Upon information and belief, Defendants were aware of their obligations under the applicable laws.

106.    As a result of Defendants' discriminatory and retaliatory treatment of Plaintiff, she suffered and continues to suffer severe emotional distress.

107.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other damages, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

108.    Defendants acted intentionally and intended to harm Plaintiff.

109.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

## FIRST CAUSE OF ACTION FOR *DISABILITY DISCRIMINATION* <u>UNDER THE ADA</u>

110.    Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

111.  Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

112.  Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. – No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

113.  At all relevant times, Plaintiff's physical and mental conditions have substantially limited her major life activities.

114.  At all relevant times, Plaintiff was qualified as "disabled" pursuant to the ADA because she was actually impaired as described in 42 U.S.C. § 12102(1)(A).

115.  Plaintiff requested reasonable accommodations.  Specifically, she requested the ability to work remotely.

116.  Defendant was aware of Plaintiff's disability and need for the accommodation of working remotely.

117.  At all relevant times, Plaintiff was qualified to perform the essential duties of an LPN with the requested reasonable accommodation.

118.  Defendant did not make a good faith effort to accommodate Plaintiff's disability.

119.  All of the accommodations that Plaintiff requested were reasonable.

120.  None of the accommodations that Plaintiff requested would have created undue hardship for Defendant.

16

121.    Defendant failed to communicate with Plaintiff meaningfully and in good faith concerning her disability and requested accommodations.

122.    Defendant discriminated against Plaintiff in violation of the ADA by refusing to accommodate her disability, treating her disparately due to her disability, and by violating her right to confidentiality and privacy regarding her disability.

123.    Defendant does not have a justifiable reasonable excuse for its adverse employment actions taken against Plaintiff.

124.    Defendant knowingly and intentionally discriminated against Plaintiff because of her disability.

125.    Defendant is liable for the acts and omissions of its agents and employees.

126.    Plaintiff suffered injuries as a result of Defendant's discrimination due to her disability.

127.    Defendant's discriminatory actions were the direct and proximate cause of Plaintiff's injuries, damages, and losses.

128.    Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when it refused to provide a reasonable accommodation for her disability.

**SECOND CAUSE OF ACTION FOR *RETALIATION*
UNDER THE ADA**

129.    Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

130.    The ADA prohibits retaliation, interference, coercion, or intimidation against an employee who engages in protected activity.

131.    42 U.S.C. § 12203 provides:

  i.       Retaliation.   No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such

17

individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

ii.      Interference, coercion, or intimidation.  It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of enjoyment of, any right granted or protected by this chapter.

132.    Plaintiff engaged in protected activity when she asked Defendant for reasonable accommodations for her disability, including the ability to work from home.

133.    As a direct result of Plaintiff's request for a reasonable accommodation, Defendant retaliated against Plaintiff by denying her request to work remotely.

134.    Defendant treated Plaintiff less favorably than her similarly situated counterparts who did not engaged in protected activity.

135.    Defendant interfered with Plaintiff in the exercise and enjoyment of her rights under the ADA by taking an adverse employment action against Plaintiff due to her need for an accommodation.

136.    Defendant is liable for the acts and omissions of its agents and employees.  Defendant, either directly or by and through its agents, retaliated against Plaintiff and caused her injuries, damages, and losses.

137.    Defendant's retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

138.    Defendant's conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

**THIRD CAUSE OF ACTION FOR *DISCRIMINATION*
UNDER TITLE VII**

139. Plaintiff repeats, reiterates, and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

140. <u>Title VII of the Civil Rights Act of 1964</u>, as amended <u>42 U.S.C.</u> § 2000e-2(a)(1), states in relevant part:

> iii. It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **sex**, or national origin[.]

141. As described above, Defendant PROHEALTH discriminated against Plaintiff on the basis of her sex, in violation of Title VII, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on her sex.

142. As a result of the unlawful discriminatory conduct of Defendant PROHEALTH in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

143. The unlawful discriminatory actions of Defendant PROHEALTH constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION FOR *RETALIATION*
UNDER TITLE VII**

144. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

19

145.     <u>Title VII of the Civil Rights Act of 1964</u>, *as amended*, <u>42 U.S.C.</u> §2000e-3(a) provides that

it shall be unlawful employment practice for an employer:

> iv.[T]o . . . discriminate against any of his employees . . . because he
> has opposed any practice made an unlawful employment
> practice by this subchapter, or because he has made a charge,
> testified, assisted or participated in any manner in an
> investigation, proceeding, or hearing under this subchapter.

146.     As described above, Plaintiff engaged in protected activities, including making internal

complaints regarding Defendant PROHEALTH's discrimination based on Plaintiff's sex.

147.     As described above, after Plaintiff engaged in activity protected by Title VII, Defendant

PROHEALTH took adverse actions against Plaintiff by, *inter alia*, terminating her

employment, that would dissuade a reasonable employee from making or supporting a

similar complaint of discrimination.

148.     Defendant PROHEALTH violated the section cited as set forth.

149.     Plaintiff is entitled to the maximum amount allowed under this statute/law.

## FIFTH CAUSE OF ACTION FOR *DISCRIMINATION* <br> UNDER THE NYSHRL

150.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

151.     <u>New York State Executive Law</u> §296(1)(a) provides that:

> v.      It shall be an unlawful discriminatory practice: For an
> employer or licensing agency, because of an individual's
> age, race, creed, color, national origin, **sexual orientation**,
> military status, **sex**, **disability**, predisposing genetic
> characteristics, marital status, or domestic violence victim
> status, to refuse to hire or employ or to bar or to discharge
> from employment such individual or to discriminate against
> such individual in compensation or in terms, conditions or
> privileges of employment.

20

152.   As described above, Defendant PROHEALTH discriminated against Plaintiff on the basis of her sex (female) and sexual orientation (gay) in violation of NYSHRL, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, based on Plaintiff's sexual orientation, sex, and disability.

153.   As a result of Defendant PROHEALTH's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

154.   Defendant PROHEALTH's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION FOR *RETALIATION* IN VIOLATION OF THE NYSHRL

155.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

156.   New York State Executive Law § 296(7) provides that:

> vi.      It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she filed a complaint, testified, or assisted in any proceeding under this article.

157.   As described above, after Plaintiff engaged in activity protected by the NYSHRL, Defendant PROHEALTH took adverse actions against Plaintiff by, *inter alia*, terminating his employment, that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

158.    Defendant violated this section as set forth herein.

159.    Plaintiff is entitled to the maximum amount allowed under this statute/law.

## SEVENTH CAUSE OF ACTION FOR *RETALIATION* IN VIOLATION OF THE NYLL §§ 740 and 741

160.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

161.    New York Labor Law § 740, et seq. states in relevant part as follows:  "An employer shall not take any retaliatory personnel action against an employee because such employee…discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule, or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud; provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer; or objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation."

162.    New York Labor Law § 741, et seq. states in relevant part as follows: "Notwithstanding any other provision of law, no employer shall take retaliatory action against any employee because the employee…discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."

163.    Defendant engaged in an unlawful discriminatory practice by retaliating against, and otherwise discrimination against Plaintiff because of Plaintiff's opposition to unlawful

22

employment practices.

164.    Plaintiff objected to, disclosed, and complained to Defendants concerning the risk of transmitting PHI over her personal computer, an action in violation of, at a minimum, 45 CFR § 164.

165.    Following Plaintiff's complaints, Plaintiff was terminated for raising concerns about transmission of PHI, harassment, discrimination, retaliation, a hostile work environment, and disparate treatment in the workplace.

166.    Plaintiff was retaliated against by Defendant for engaging in protected activity.

167.    Defendant had no valid business justification for the retaliatory and abusive actions taken against Plaintiff following her engagement in protected activity.

168.    As a direct result of the acts and conduct complained of herein, Plaintiff has suffered loss of income, loss of employment, inconvenience, special damages, loss of employment benefits, and other damages, and Plaintiff has also suffered future pecuniary losses, humiliation, anger, depression, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

169.    Defendant's conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

170.    Plaintiff is entitled to the maximum amount allowed under this statute.

## **JURY DEMAND**

171.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.      Declaring that Defendants engaged in unlawful employment practices prohibited by the

ADA, Title VII, NYSHRL, and NYLL in that Defendants discriminated against Plaintiff on the basis of her sexual orientation, sex, and disability, and retaliated against Plaintiff by terminating Plaintiff for engaging in protected activity;

B.  Awarding damages to Plaintiff for all damages resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's State-law claims;

D.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated:      Garden City, New York
            April 29, 2022

                                **PHILLIPS & ASSOCIATES,**
                                **ATTORNEYS AT LAW, PLLC**

                        By:     _____/s/_____
                                Joshua Friedman, Esq.
                                *Attorneys for Plaintiff*
                                585 Stewart Avenue Suite 410
                                Garden City, New York 11530
                                T: (212) 248-7431
                                F: (212) 901-2107
                                jfriedman@tpglaws.com